# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Case No. 13-CR-915 |
| v. | ) | |
| | ) | Judge Robert M. Dow, Jr. |
| WILLIAM D. CORRIGAN, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Defendant William D. Corrigan ("Defendant") was charged with four counts of wire fraud, 18 U.S.C. § 1343, in connection with his alleged scheme to solicit investments in his company, Embedded Control Systems ("ECS"), by falsely representing to two investors that their money was needed and would be used for health insurance for ECS employees. See [80] (Amended Indictment). Defendant voluntarily waived his right to a jury trial [81] and elected to proceed with a bench trial, which began on December 15, 2015 and concluded on December 17, 2015. See [83], [84], [85]. Prior to the bench trial, Defendant filed a motion to dismiss on sovereign immunity grounds [18], a motion to dismiss due to "Declaration of Immunity Mandate" [27], and a motion to dismiss Counts 2, 3, and 4 of the Indictment [75], and the Government filed a motion *in limine* [68]. The Court reserved ruling on these motions until after trial. Following trial, Defendant also filed two motions for leave to file an over-size post-trial brief [94], [96], a motion to file a corrected table of contents to Defendant's post-trial brief [95], and a motion for leave to file a reply brief in support of his motion to dismiss [98].

For the reasons explained in Section I below, the Court denies Defendant's motion to dismiss on sovereign immunity grounds [18] and motion to dismiss due to "Declaration of

Immunity Mandate" [27]; grants Defendant's motion for leave to file a reply in support of his

motion to dismiss Counts 2, 3, and 4 of the Indictment [98]; denies Defendant's motion to

dismiss Counts 2, 3, and 4 of the Indictment [75]; grants the Government's motion *in limine*

[68]; grants Defendant's first-filed motion for leave to file an over-size post-trial brief [94];

denies as moot Defendant's duplicative motion for leave to file an over-size post-trial brief [96];

and grants Defendant's motion to file a corrected table of contents to his post-trial brief [95].  For

the reasons explained in Sections II and III below, the Court concludes that the Government

established beyond a reasonable doubt that Defendant, on four occasions, committed wire fraud

in violation of 18 U.S.C. § 1343.  Accordingly, the Court finds Defendant guilty of the charges in

the Amended Indictment [80].  This matter is set for status on September 28, 2016 at 10:00 a.m..

## I.      Pre- and Post-Trial Motions

### A.      Defendant's Immunity Motions

Prior to trial, Defendant filed a motion to dismiss due to sovereign diplomatic immunity

[18] and a motion to dismiss due to immunity protection per "Declaration of Immunity Mandate"

of October 7, 2011 [27].  Although Defendant was represented by counsel when the motions

were filed, see [16], Defendant appears to have prepared and filed the motions himself, acting

*pro se*.[1]  This Court has "wide discretion to reject *pro se* submissions by defendants represented

by counsel."  *United States v. Patterson*, 576 F.3d 431, 437 (7th Cir. 2009).  In this case, the

Court accepts Defendant's submissions, but concludes that they lack merit and must be denied.

Defendant asserts in both motions that he filed a "declaration of immunity" with an

administrative office of the United States Courts and that the declaration is posted and can be

verified on all "Federal Screens," including "Blue," "Grey," "Green," and "Black."  Defendant

---

[1] The first motion [18] is typewritten, unsigned, and has no caption; the second motion [27] is handwritten and signed by Defendant.

argues that because he enjoys immunity, all charges against him must be dismissed. Defendant does not identify any law or facts that would give him a right to immunity protection. Defendant does not claim, for instance, to be a foreign diplomat. And the Seventh Circuit has "repeatedly rejected . . . theories of individual sovereignty, immunity from prosecution, and their ilk," like Defendant asserts here. *United States v. Benabe*, 654 F.3d 753, 767 (7th Cir. 2011). In short, Defendant fails to establish that he is entitled to have the charges against him dismissed on immunity grounds. Therefore, Defendant's motions, [18] and [27], are denied.

**B.      Defendant's Motion to Dismiss the Indictment**

A grand jury returned a four-count indictment ("Indictment") against Defendant in March 2013. See [4]. The Indictment identified two victims of Defendant: Victim 1, an ECS investor who resided in Wisconsin; and Victim 2, an ECS investor who resided in Colorado. The transcript from the Grand Jury shows that the Grand Jury understood Victim 1 to mean Jason Neilitz ("Neilitz") and for Victim 2 to mean Rawah Partners. [99-1] at 2. The Indictment alleged that Defendant intentionally devised and participated in a "scheme to defraud and to obtain money and property from Victim 1 and Victim 2 by means of materially false and fraudulent pretenses, representations, and promises, and by concealment of material facts." [4] at 2. According to the Indictment, "in or about March 2009, Corrigan asked Victim 1 and a representative of Victim 2 if they wanted to buy Company A stock, and, in doing so, falsely represented to them that he would use the investment money to pay Company A's health insurance expenses." *Id.* The Indictment further alleges that, as part of the scheme, Defendant "fraudulently induced Victim 1 to transfer $50,000 into [his] Bank of America personal account" on April 24, 2009, fraudulently induced Victim 2 to transfer $50,000 to his personal account on March 30, 2009, and fraudulently induced Victim 2 to transfer another $10,000 to his personal account on April 9, 2009. [4] at 3. According to the Indictment, Defendant did not use the

money to pay for ECS's health insurance, and instead used a portion of the money to pay his personal expenses while falsely representing to his victims that the money had been used on health insurance.

The original Indictment alleged that Defendant committed four counts of wire fraud by sending emails, all to "Victim 2," on March 22, 2009 (Count 1), March 25, 2009 (Count 2), November 7, 2011 (Count 3), and November 9, 2011 (Count 4). See [4] at 5-8. Specifically, Count 1 alleged that on March 22, 2009, Defendant emailed Victim 2 asking if Victim 2 would be interested in buying some additional stock in Company A. [4] at 5. Count 2 alleged that on March 25, 2009, Defendant emailed a representative of Victim 2 asking if he could sell Victim 2 another $50,000 in stock "to pay the Health Insurance by the end of March." [4] at 6. Count 3 alleged that on November 7, 2011, Defendant emailed the following statement to Victim 2, "Your funds did go into [Company A]." *Id.* at 7. Count 4 alleged that on November 9, 2011, Defendant sent an email to Victim 2 stating, "I can assure you that your 60k was used to pay up Health Insurance in 2009." [4] at 8.

On December 9, 2015, Defendant moved to dismiss Counts 2, 3, and 4 of the Indictment on the ground that they were multiplicitous of Count 1. See [75]. The Court deferred briefing on the motion until the conclusion of the bench trial. See [77]. On December 10, 2015, the Government filed a motion to file an amended indictment [76], which Defendant did not oppose, *id.* at 2. The Government explained that there were typographical errors in the first paragraphs of Counts 2, 3, and 4 because they purported to incorporate paragraphs 1 through 16 of Count 1 even though Count 1 included only twelve paragraphs. *Id.* The Government requested to amend the indictment so that Counts 2, 3, and 4 incorporate the correct paragraphs 1 through 11 of Count 1.

The Court granted the Government's motion [83] and the amended indictment

("Amended Indictment") [80] was filed on the docket.  In addition to fixing the typographical errors noted in its motion to amend, the Amended Indictment also identifies the ECS investor who resided in Wisconsin as Jason Neilitz (Victim 1 in the original indictment) and the ECS investor who resided in Colorado as Rawah Partners (Victim 2 in the original indictment).  As is relevant here, in Count 1 of the Amended Indictment the Government alleges that on March 22, 2009, Defendant asked Neilitz—rather than "Victim 2" as alleged in the original complaint—if Neilitz was interested in buying some additional stock in ECS.  [80] at 5.

Following trial, Defendant filed a motion for leave to file a reply in support of his motion to dismiss.  See [98].  The Court now grants Defendant's motion for leave to file a reply brief [98] and turns to the merits of the motion to dismiss.[2]

### 1.    Constructive Amendment

Defendant argues that Count 1 of the Amended Indictment must be dismissed because the Government's substitution of "Neilitz" for "Victim 2" as the recipient of Defendant's March 22, 2009 email constitutes a constructive amendment to the original Indictment, which the Government failed to resubmit to the Grand Jury in violation of the Fifth Amendment.

"The Fifth Amendment guarantee of the right to indictment by a grand jury" and "its protection against double jeopardy"—along with the "Sixth Amendment guarantee that a defendant be informed of the nature of the charges against him"—"establish the minimum requirements for an indictment."  *United States v. Fassnacht*, 332 F.3d 440, 444 (7th Cir. 2003).  To comport with these constitutional requirements, an indictment must accomplish three functions: (1) state each element of each crime charged; (2) provide adequate notice of the nature

---

[2] Defendant makes somewhat different arguments in his reply brief than he did in his motion to dismiss, presumably because he filed the motion to dismiss before the Government filed the Amended Indictment. This opinion focuses primarily on the Amended Indictment and the arguments that Defendant raises in his reply brief.

of the charges so as to enable the defendant to prepare his defense; and (3) allow the defendant to raise the judgment as a bar to future prosecutions for the same offense. *Id*. at 444-45. "[A]fter an indictment has been returned its charges may not be broadened through amendment except by the grand jury itself." *Stirone v. United States*, 361 U.S. 212, 215-16 (1960); see also *United States v. Leichtnam*, 948 F.2d 370, 376 (7th Cir. 1991).

"A constructive amendment of an indictment occurs when the evidence at trial 'goes beyond the parameters of the indictment in that it establishes offenses different from or in addition to those charged by the grand jury.'" *United States v. Phillips*, 745 F.3d 829, 832 (7th Cir. 2014) (quoting *United States v. Pigee,* 197 F.3d 879, 886 (7th Cir. 1999)). A constructive amendment of an indictment "violates the Fifth Amendment." *Id.* However, "'not all variations in proof that contradict or supplement verbiage in the indictment rise to the level of constructive amendments.'" *Id.* (quoting *United States v. Willoughby*, 27 F.3d 263, 266 (7th Cir. 1994). To constitute an impermissible constructive amendment, "the crime charged in the indictment must be 'materially different or substantially altered at trial, [so that] it is impossible to know whether the grand jury would have indicted for the crime actually proved.'" *Id.* (quoting *United States v. Trennell*, 290 F.3d 881, 888 (7th Cir. 2002)). Changes in the indictment that are "merely a matter of form"—such as changes "to correct for a typographical or clerical error or a misnomer"—"do not constitute 'amendments'" to the indictment. *Leichtnam*, 948 F.2d at 376; see also Black's Law Dictionary (10th ed. 2014) (misnomer: "[a] mistake in naming a person, place, or thing, esp. in a legal instrument"). When it does not rise to the level of a constructive amendment, a variance between the indictment and what the Government is required to prove at trial is fatal only where a defendant is prejudiced in his defense because he cannot anticipate from the indictment what evidence will be presented against him or her is exposed to double jeopardy. *United States v. Howard*, 619 F.3d 723, 727 (7th Cir. 2010).

The Court concludes that, in this case, the Government did not constructively amend Count 1 of the Amended Indictment in violation of the Fifth Amendment. At trial, the Government presented evidence in support of Count 1 that, as part of his scheme to defraud and obtain money and property from Neilitz and Rawah Partners, Defendant sent Neilitz an email on March 22, 2009 seeking investment funds purportedly to pay for health insurance. It is not impossible to know whether the Grand Jury would have indicted Defendant for wire fraud based on that wire communication, *Phillips*, 745 F.3d at 832, because it is clear from the transcript of the November 20, 2013 grand jury proceedings that the March 22, 2009 email on which Count 1 was based was "an email from [Defendant] to Jason Neilitz." [99-1] at 2. The insertion of the victim's identity in Count 1 of the Amended Indictment merely corrected a misnomer and did not constitute a constructive amendment that violates the Fifth Amendment. *Leichtnam*, 948 F.2d at 376; see also *United States v. Whoolery*, 579 F. App'x 78, 81 (3d Cir. 2014) (government's characterization during trial of borrowers as victims did not constructively amend indictment charging defendant with conspiracy to commit wire fraud, which alleged that lenders, not borrowers, were the victims of defendant's residential mortgage fraud scheme, because identification of a victim was not an element of conspiracy to commit wire fraud and any reference to a victim or victims was superfluous and unnecessary to the elements of the charged offense and indictment mentioned fraudulent actions taken toward both borrowers and lenders); *United States v. Lucien*, 78 F. App'x 141, 143 (2d Cir. 2003) (substitution of insurer for claims adjuster initially named as defrauded "health care benefit program" in health care fraud indictment did not constitute constructive amendment of indictment, where change did not raise danger that defendant was convicted of different crime than one charged by grand jury).

The Court further concludes that there was not a fatal variance between the Indictment and what the Government proved at trial. Prior to trial, the Indictment was replaced with the

Amended Indictment, with no objection from Defendant. Moreover, even before the Indictment was corrected, Defendant could anticipate that Count 1 would be based on evidence surrounding his March 22, 2009 email to Neilitz. The original Indictment identified two victims and alleged that in March 2009, Defendant asked both "Victim 1 and a representative of Victim 2 if they wanted to buy Company A stock" and falsely represented to both "that he would use the investment money to pay Company A's health insurance expenses." [4] at 1-2. While Count 1 of the original Indictment erroneously referred to the recipient of the March 22, 2009 email as "Victim 2" rather than "Victim 1," the email on which Count 1 was based was a Grand Jury exhibit and clearly showed that the recipient was Neilitz. See *United States v. Ratliff-White*, 493 F.3d 812, 823-24 (7th Cir. 2007) (variance between indictment, which pinpointed a particular step in payment process, and proof at trial, which established another, was harmless in wire fraud prosecution, where defendant had notice by the description of the scheme in the indictment to prepare its defense and the prosecution disclosed exhibits to the defendant before trial); *United States v. Steele*, 82 F. App'x 172, 176-77 (7th Cir. 2003) (error in indictment concerning defendant's prior conviction did not require reversal where mislabeling did not confuse or mislead defendant). Therefore, Defendant was able to anticipate prior to trial what evidence would be presented against him on Count 1. See *Howard*, 619 F.3d at 727.

Finally, there is no risk of Defendant being exposed to double jeopardy, *Howard*, 619 F.3d at 727, because the Government fixed the misnomer in Count 1 of the Amended Indictment. It would be clear to anyone looking at the Amended Indictment that Count 1 is based on a wire communication sent from Defendant to Neilitz on March 22, 2009 and, therefore, Defendant does not face the risk of being charged with the same crime twice.

### 2. Multiplicity

Defendant argues that Counts 3 and 4 of the Amended Indictment must be dismissed

because they are multiplicitous of Count 2. In particular, Defendant argues that the underlying wire transactions identified in Counts 2, 3 and 4 of the Amended Indictment constitute executions of the same scheme to obtain a $50,000 investment from Rawah Partners purportedly so Defendant could pay his company's health insurance. Defendant argues that the only wire communication properly charged is the March 25, 2009 email identified in Count 2, in which Defendant told Rawah Partners' agent, Kevin Duncan ("Duncan"): "Today, I asked you if we could sell another $50k to you in stock. I need this to pay the Health Insurance by the end of March." [80] at 6. According to Defendant, the November 7 and November 9, 2011 emails identified in Counts 3 and 4 were "neither essential to, nor a step toward, the execution of the scheme described in the Indictment." [97] at 4.

"Multiplicity is the charging of a single offense in separate counts of an indictment. This exposes a defendant to the threat of receiving multiple punishment for the same offense. In order to determine whether a given indictment contains multiplicitous counts, we look to the applicable criminal statute to see what the allowable 'unit' of prosecution is—the minimum amount of activity for which criminal liability attaches." *United States v. Allender*, 62 F.3d 909, 912 (7th Cir. 1995).

Plaintiff was charged with four counts of wire fraud in violation of 18 U.S.C. § 1343, which provides:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.

In mail and wire fraud cases, "each mailing or interstate communication" sent in

furtherance of a fraudulent scheme "is a separate indictable offense, even if each relates to the same scheme to defraud." *Ashland Oil, Inc. v. Arnett*, 875 F.2d 1271, 1278 (7th Cir. 1989) (citing *United States v. Aldridge,* 484 F.2d 655, 660 (7th Cir. 1973)) (emphasis added); see also Pattern Criminal Jury Instructions of the Seventh Circuit, *18 U.S.C. §§ 1341 and 1343 Use of Mails/Interstate Carrier/Interstate Communication Facility*, p. 409 (2012) ("[Each separate use of [the mail] [an interstate carrier] [interstate communications facilities] in furtherance of the scheme to defraud constitutes a separate offense.]").

In order to obtain a conviction for wire fraud, the Government is required to prove Defendant's "participation in a scheme to defraud, his intent to defraud, and his use of the wires in furtherance of the fraudulent scheme." *United States v. McGowan*, 590 F.3d 446, 457 (7th Cir. 2009). A communication need not be made before or at the time the Defendant obtains the victim's money in order to support a charge of wire fraud. "Wire communications that lull a victim into a false sense of security after the victim's money had already been obtained, or that assist the defendant in avoiding detection may be sufficient to further a scheme." *Id.*; see also *United States v. Freed*, 2016 WL 374133, at *3 (N.D. Ill. Feb. 1, 2016).

In this case, Counts 2, 3 and 4 of the Amended Indictment each identify a wire communication that Defendant made in furtherance of his alleged scheme to defraud Rawah Partners. Count 2 is based on an email Defendant sent to Duncan (Rawah Partners' agent) on March 22, 2009 stating: "Today, I asked you if we could sell another $50k to you in stock. I need this to pay the Health Insurance by the end of March." [80] at 6. Count 3 is based on an email Defendant sent to Duncan on November 7, 2011, assuring him "Your funds did go into ECS." [80] at 7. And Count 4 is based on an email that Defendant sent to Duncan on November 9, 2011, stating "I can assure you that your 60k was used to pay up Health Insurance in 2009." [80] at 8. The Amended Indictment suggests that these later communications were intended to

"lull [the] victim[s] into a false sense of security after [their] money had already been obtained," and also to "avoid[] detection" of Defendant's fraudulent scheme. *McGowan*, 590 F.3d at 457.

The fact that these communications occurred several years after the communication described in Count 2 is irrelevant, given that they occurred while the scheme was ongoing. [80] at 2, ¶ 2 (allegation in Amended Indictment that Defendant's scheme lasted from approximately March 2009 to March 2012); see also *McGowan*, 590 F.3d at 457 (eighteen telephone calls made by defendant after the government knew about the fraud and after defendant had obtained the victim's money furthered the scheme to defraud, and therefore supported Defendant's conviction for eighteen counts of wire fraud under 18 U.S.C. § 1343); *United States v. Cherif*, 943 F.2d 692, 696 (7th Cir. 1991) (indictment stated violation of mail and wire fraud statutes based on mailings and wirings, although former bank employee alleged that mailings and wirings necessary for his stock transactions occurred long after he fraudulently obtained information about stocks from bank, where stock trades were integral part of fraudulent scheme and whole point of scheme); *United States v. Dacri*, 827 F. Supp. 550, 555-56 (E.D. Wis. 1993) (counts of mail fraud indictment alleging that defendant mailed progress report and project profile to investor and mailed letter in response to investor's request for accounting were not constitutionally deficient on grounds that mailings were allegedly made after funds had been obtained from alleged victims and thus could not have been in furtherance of scheme to defraud; government alleged that these mailings furthered fraudulent scheme by lulling victims into false sense of security that minimized their ability to detect fraud and recover their money, and alleged mailings did not occur after time at which indictment alleged that fraudulent scheme had ended).

Defendant cites to cases involving the federal bank fraud statute for the proposition that each wire transaction charged in the indictment must itself constitute an execution of the scheme charged. But unlike the wire fraud statute, the bank fraud statute "'punish[es] each execution of

a fraudulent scheme rather than each act in furtherance of such a scheme.'" *United States v. Longfellow*, 43 F.3d 318, 323 (7th Cir. 1994) (quoting *United States v. Molinaro,* 11 F.3d 853, 859 (9th Cir. 1993)); see also *United States v. Ajayi*, 808 F.3d 1113, 1120 (7th Cir. 2015). Therefore, cases involving the bank fraud statute are inapposite.

For these reasons, Defendant's motion to dismiss [75] is denied in full.

**C.**    **The Government's Motion** *in Limine*

In its motion *in limine* [68], the Government asked the Court exclude from trial all evidence of Defendant's lawfulness and good conduct, except reputation and opinion evidence offered by character witnesses strictly in accordance with Rule 405(a) of the Federal Rules of Evidence.  Defendant did not respond to the Government's motion.

"Evidence of a person's character or character trait is not admissible to prove that on a particular occasion the person acted in accordance with the character or trait."  Fed. R. Evid. 404(a)(1).  Similarly, "[e]vidence of a crime, wrong, or other act" (including "good" acts, see *United States v. Hill*, 40 F.3d 164, 168 (7th Cir. 1994)), "is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."  Fed. R. Evid. 404(b)(1).  Such evidence may be admissible, however, "for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  Fed. R. Evid. 404(b)(2).  The Seventh Circuit has opined that Rule 404(b) "proscribes the admission" of "character evidence offered to prove that [the defendant] had a good character and acted in conformity therewith."  *Hill*, 40 F.3d at 168.

"When evidence of a person's character or character trait is admissible" for some proper purpose, "it may be proved by testimony about the person's reputation or by testimony in the form of an opinion."  Fed. R. Evid. 405(a). "On cross-examination of the character witness, the court may allow an inquiry into relevant specific instances of the person's conduct."  *Id*.  For

example, in *Hill*, the Seventh Circuit held that evidence that a defendant charged with mail theft and forgery did not take "test letters" sent by investigators was not admissible to show her character trait for law-abidingness, even if law-abidingness was a pertinent character trait for the charged crimes, because that trait was only provable under Rule 405 by reputation evidence, not by specific instances in which she abided by the law. 40 F.3d at 168; see also *United States v. Reese*, 666 F.3d 1007, 1020 (7th Cir. 2012) (evidence that a defendant acted lawfully on other occasions is generally inadmissible to prove he acted lawfully on the occasion alleged in the indictment); *United States v. Santos*, 65 F. Supp. 2d 802, 845-46 (N.D. Ill. 1999) ("[a] defendant may not seek to establish his [or her] innocence . . . through proof of the absence of criminal acts on specific occasions" (internal quotation marks and citation admitted)).

Based on Rule 405(a) and the foregoing precedent, the Court grants the Government's motion *in limine* [68]. In its findings of fact, the Court will not rely on evidence of Defendant's lawfulness and good conduct, unless it concludes that: (1) Defendant has demonstrated that the evidence is admissible for some purpose other than as evidence that Defendant acted in conformity therewith; and (2) Defendant has offered the evidence through testimony about Defendant's reputation or testimony in the form of an opinion pursuant to Rule 405(a).

### D.     Miscellaneous Post-Trial Motions

Following trial, Defendant filed two motions for leave to file an over-size post-trial brief, [94] and [96]. The motions request identical relief. The Court grants Defendant's first-filed motion [94] and denies as moot the second-filed motion [96]. Defendant also filed a motion for leave to amend the table of contents to his post-trial brief [95]. That motion [95] is granted. Defendant has filed and the Court has given due consideration to Defendant's over-size post-trial brief [97] and amended table of contents [95], as well as to the letter that Defendant's counsel filed on April 14, 2016 [100].

## II.     Findings of Fact

After carefully considering all of the parties' submissions ([90], [92], [95], [97], [99], [100]) and the evidence adduced at trial, the Court makes findings of fact and conclusions of law pursuant to Fed. R. Crim. P. 23(c).   To the extent, if any, that findings of fact, as stated, may be considered conclusions of law, they should be deemed conclusions of law.   Similarly, to the extent that matters expressed as conclusions of law may be considered findings of fact, they should be deemed findings of fact.   In the end, the Court concludes that the Government established beyond a reasonable doubt that Defendant committed four counts of wire fraud in violation of 18 U.S.C. § 1343.   Accordingly, the Court finds Defendant guilty of the charges in the Amended Indictment.

ECS is a technology company that developed a way to replace copper wire on aircraft with optical fiber, which is lighter and less costly.  (Tr. 34, Dec. 15, 2015 p.m.)  Defendant was ECS's President and Chief Executive Officer during the time periods relevant to the Amended Indictment.  (Tr. 37, Dec. 15, 2015 p.m.)  A.J. Yarmie ("Yarmie") was ECF's Chief Financial Officer and Vice President of Business Development; Gabe Vlad ("Vlad") was ECS's Chief Technology Officer and Secretary; and Terri Lancelot ("Lancelot") was ECS's contract accountant.  (Tr. 35-37, Dec. 15, 2015 p.m.; Tr. 4, Dec. 16, 2015 a.m.)

ECS's CTO, Vlad, also had a company called Digital Thinkers.  (Tr. 40, Dec. 15, 2015 p.m.)  Employees of Digital Thinkers "were doing direct work for ECS."  (Tr. 60, Dec. 15, 2015 p.m.)  Digital Thinkers purchased a United Healthcare policy to provide its employees with health insurance.  (*Id*.; Gov. Ex. United Healthcare Chart.)  ECS used its company funds to pay the health insurance premiums.  (Tr. 60, Dec. 15, 2015 p.m.)

By 2006, ECS's executives were attempting to sell ECS to another company.  (Tr. 48, Dec. 15, 2015 p.m.)  Dubai Aerospace was considering purchasing ECS and Defendant was the

principal negotiator of the proposed deal. (*Id*.) That sale did not come to fruition and Defendant continued to seek out buyers. (Tr. 49-50, Dec. 15, 2015 p.m.)

ECS began issuing shares in the company in 2007, first to founders, friends and family and then to outside investors. (Tr. 95, Dec. 15, 2015 p.m.) Two ECS investors are involved in this case: Neilitz and Rawah Partners. See [80]. In 2007, Neilitz bought $125,000 in ECS shares (Tr. 7-9, Dec. 16, 2015 p.m.), and Rawah Partners bought $350,000 in ECS shares (Tr. 60-64, Dec. 16, 2015 a.m.).

ECS began experiencing cash flow difficulties. Until June 2008, ECS had an account with Chase Bank. (Tr. 43-44, Dec. 15, 2015 p.m.) ECS had a number of overdrafts on the account and, eventually, was not allowed to have immediate access to funds when they were deposited. (*Id*.) As a result, in June 2008 ECS closed its Chase Bank account and opened a LaSalle Bank account. (*Id*.)

ECS also fell behind on payments for the United Healthcare insurance policy in 2008. (Tr. 61, Dec. 15, 2015 p.m.; Gov. Ex. United Healthcare Chart.) In December of that year, ECS stopped making payments on the policy. (Tr. 61, Dec. 15, 2015 p.m.; Tr. 69, Dec. 16, 2015 p.m.) United Healthcare canceled the policy in January 2009. (Tr. 61-62, Dec. 15, 2015 p.m.; Tr. 69, Dec. 16, 2015 p.m.) At the time that the policy was cancelled, it would have cost $19,192.84 to reinstate. (Tr. 69-70, Dec. 16, 2015 p.m.)

By 2009, Defendant began expressing a romantic interest in a woman who lived in the Ukraine, Natalia Vasilenko ("Vasilenko"). (Gov. Ex. Mar. 16, 2009 Corrigan Email; Tr. 42-43, Dec. 15, 2015 p.m.; Tr. 8, Dec. 16, 2015 a.m.) Defendant communicated with Vasilenko through a translator named Yuliya or Julia Leshenko ("Leshenko"). (Gov. Ex. Mar. 16, 2009 Corrigan Email; Gov. Ex. Western Union Chart.) Defendant expressed a desire to marry Vasilenko. (Gov. Ex. Mar. 16, 2009 Corrigan Email; Tr. 41, Dec. 15, 2015 p.m.; Tr. 8, Dec. 16,

2015 a.m.)  On March 21, 2009, Defendant emailed Vasilenko that he was "sooo disappointed" that he did not have sufficient funds to travel to Kiev, Ukraine to see her the following week for her twenty-sixth birthday.  (Gov. Ex. Mar. 21, 2009 Corrigan Email.)

The next day, March 22, 2009, Defendant emailed Neilitz about making an additional investment in ECS.  (Gov. Ex. Mar. 22, 2009 Corrigan Email.)  This email is the basis for Count 1 of the Amended Indictment.  See [80] at 5.  Defendant wrote: "While we are within weeks of closing, we have a couple of issues that need to be addressed.  The primary one is Health Insurance Premiums for our team.  We may lose our coverage by waiting for the final funds to arrive.  We would like to raise about $50k - $100k.  We have avoided this until now because we did not wish to dilute the stock, but this could be a serious problem for some.  We will be getting closing funds in April, but we are staring at an end of March deadline for this."  (Gov. Ex. Mar. 22, 2009 Corrigan Email.)  Neilitz understood from this email that ECS needed additional money to pay health insurance premiums for its employees.  (Tr. 13, Dec. 16, 2015 p.m.)

The next morning, March 23, 2009, Defendant emailed Leshenko (his translator) that "I am trying to get some short term funds from 3 investors in my firm now" and "[i]f successful, I will send some to you."  (Gov. Ex. Mar. 23, 2009 Corrigan Email 1.)  The same day, Defendant spoke with Neilitz over the phone.  (Tr. 15, Dec. 16, 2015 p.m.)  Neilitz understood based on the conversation that ECS "had a short-term cash crunch window until the sale of ECS" and "it could potentially be catastrophic if they weren't able to cover the health insurance premiums until the sale of ECS."  (Tr. 16, Dec. 16, 2015 p.m.)  Defendant did not tell Neilitz that the investment money would be spent on anything other than health insurance premiums for ECF employees.  (*Id.*)

Around the same time, Defendant also reached out by telephone and email to Duncan, Rawah Partners' representative, about investing additional funds in ECS.  (Tr. 65-66, Dec. 16,

2015 a.m.)  Defendant represented to Duncan that approximately $60,000 was needed to pay the health insurance premiums for employees working for ECS.  (Tr. 66, Dec. 16, 2015 a.m.)  On March 25, 2009, Defendant emailed Duncan a stock subscription to purchase 200 shares of ECS at $250 per share, for a total price of $50,000.  (Gov. Ex. Mar. 26, 2009 Corrigan Email at 2.)  Duncan responded that this could be a "harder sell" to Rawah Partners than its initial investment in 2007 "given the time delays we have experienced so far."  (*Id.*)  In his reply email—which is the basis for Count 2 of the Indictment, see [80] at 6—Defendant stated: "Today, I asked you if we could sell another $50k to you in stock.  I need this to pay the Health Insurance by the end of March.  Our Provider is threatening to cancel coverage for our group.  This would leave 10-15 families without Health Coverage, but worse, they will lose 'pre-existing conditions' with any future Health Coverage.  Among our families here, we have newborn babies, chronic conditions, and some serious medical issues with family members."  (Gov. Ex. Mar. 26, 2009 Corrigan Email at 2.)  Defendant stated further that he could "resolve this by selling you this stock."  (*Id.*)  Defendant also stated that "we should have an exit distribution about mid-May" and are "estimating the return to be about $800 per share."  (*Id.*)  In response, Duncan asked whether Rawah Partners could receive 400 shares for its $50,000 investment rather than the 200 shares Defendant offered.  (Gov. Ex. Mar. 26, 2009 Corrigan Email at 1.)  Early the next morning, Defendant agreed and sent Duncan an updated stock subscription agreement.  (*Id.*)  The ECS Board did not vote to lower the price of ECS shares from $250 to $125 per share.  (Tr. 55, Dec. 15, 2015 p.m.)

The following morning, March 27, 2009, Defendant emailed Leshenko, "It looks like I may actually get some funds from an investor of mine.  The banks are still not coming through.  However, I am planning to send you some money this weekend or on Monday, when the funds arrive.  I am expecting them tomorrow, but you never can be sure until it arrives."  (Gov. Ex.

Mar. 27, 2009 Corrigan Email.) In the same email, Defendant included a note for Vasilenko informing her that he was moving out of his home within the next week and would be moving to a temporary place until he closed on another home that he intended to buy. (*Id.*) Later in the day, Defendant emailed Duncan: "I hope you will be moving forward with the investment and wire the funds. I would appreciate hearing from you either way. If you proceed, then I will not need to look any further. If not, I will have the weekend to talk with other investors to meet my Wednesday timeline with the health insurance." (Gov. Ex. Mar. 27, 2009 Duncan Email at 1.) Duncan responded that he planned "to wire the money on Monday morning." (*Id.*)

Duncan followed Defendant's instruction to wire the $50,000 to "William Corrigan, ECS Corporation." (Gov. Ex. Mar. 25, 2009 Duncan Email.) That account was Defendant's personal account. (Tr. 66-67, Dec. 15, 2015 p.m.) Duncan believed that he was sending money to ECS's account and testified that he would not have sent the money if he had known that it was going to Defendant's personal account or that Defendant would spend any of the money on himself. (Tr. 69-70, 116, 135, Dec. 16, 2015 a.m.) Defendant received the wire transfer of Rawah Partners' funds on March 30, 2009. (Gov. Ex. Mar. 2009 Corrigan BOA Statement at 3.)

Defendant did not have authorization from ECS to use his personal account for investor funds transfers. (Tr. 66-67, Dec. 15, 2015 p.m.) To the contrary, in mid-2009 ECS's contract accountant, Lancelot, told Defendant that he should not have investors transfer funds into his personal account—which Defendant wanted to do to prevent Vlad from having access—because it would be illegal and would prevent proper accounting for the funds. (Tr. 20, Dec. 16, 2015 a.m.) Lancelot told Defendant that if he wanted funds for himself, he should have the investors send money to ECS and then take out a loan from ECS. (Tr. 21, Dec. 16, 2015 a.m.) Lancelot did not know that, despite her warnings, Defendant went ahead and arranged for investors to transfer money to his personal account. (*Id.*)

When Defendant received Rawah Partners' wire transfer on March 30, 2009, it raised his account balance from $192.73 to $50,192.73. (Gov. Ex. Mar. 2009 Corrigan BOA Statement at 3.) Early in the morning on March 31, 2009, Defendant emailed Leshenko that "I finally received some money yesterday, although not a large amount," and "will be sending you a Western union today or tomorrow." (March 31, 2009 Corrigan Email.)

Defendant immediately began spending the money that he received from Rawah Partners. (See Gov. Ex. Summary Chart; Mar. 2009 Corrigan BOA Statement; April 2009 Corrigan BOA Statement.) On April 1, 2009, Defendant sent wire transfers of $1,000 each to Leshenko and Vasilenko. (Gov. Ex. Western Union Chart.) On April 1, 2009, Defendant paid $1,275 to Two Men And A Truck, a moving company (Gov. Ex. Mar. 2009 Corrigan BOA Statement at 4), and on April 3, 2009, Defendant told Leshenko that he had completed moving to his new temporary residence (Gov. Ex. Apr. 3, 2009 Corrigan Email). On April 2, 2009, Corrigan paid $4,134 to Fragomen Del Rey Bernse, a law firm specializing in immigration law. (Mar. 2009 Corrigan BOA Statement at 4.) A few weeks earlier, Defendant had told Leshenko that he was speaking to immigration lawyers about bringing Vasilenko to the United States. (Gov. Ex. Mar. 21, 2009 Corrigan Email.) In total, Defendant withdrew more than $30,000 in cash and money transfers from his account. Defendant also used the funds in his account to pay bills from grocery stores, restaurants, parking garages, hotels, an animal hospital, Dish Network, Skype and a dating website. (Gov. Ex. Mar. 2009 Corrigan BOA Statement at 3-5.)

In early April 2009, Duncan agreed on behalf of Rawah Partners to purchase an additional $10,000 worth of ECS shares for $125 per share. (Tr. 80-82, Dec. 16, 2015 a.m.) Defendant and Duncan signed a stock subscription agreement, which provided that "Payment of the total purchase price has been delivered to ECS simultaneously with the signing of this Agreement." (Gov. Ex. Apr. 6, 2009 Stock Agreement at 1.) Defendant directed Duncan to wire

the funds to "William Corrigan, ECS Corporation," which was Defendant's personal account. (Gov. Ex. Apr. 8, 2009 Corrigan email.) Duncan thought that the money would be going into the ECS corporate account. (Tr. 81-82, Dec. 16, 2015 a.m.) Corrigan received Rawah Partners' $10,000 wire payment on April 9, 2009. (Gov. Ex. Mar. 2009 Corrigan BOA Statement at 5.) This payment raised the balance in Defendant's account from $9,087.49 to $19,087.49. (*Id.*)

Defendant used the funds in his account to pay bills from restaurants, a car wash, Dish Network, and a dating website. (Gov. Ex. Mar. 2009 Corrigan BOA Statement at 5-6.) Defendant also withdrew $2,500 in cash and transferred $2,500 to Alla Mironshnychenko, Leshenko's friend who was visiting Defendant. (Gov. Ex. Mar. 2009 Corrigan BOA Statement at 6; Gov. Ex. Summary Chart at 3; Gov. Ex. Mar. 23, 2009 Corrigan Email 1.)

On April 16, 2009, Defendant emailed Vasilenko, through Leshenko, about his plans to visit the Ukraine. Defendant wrote: "I have not received my funds by wire yet and it looks like the money will arrive next week. I really do need to wait for the money to be in my account before booking this trip. However, I will have plenty to come and have fun with you once I receive the money." (Gov. Ex. Apr. 16, 2009 Corrigan Email at 1.) The same day, Defendant wired $600 to Leshenko from his personal account. (Gov. Ex. Western Union Chart.)

After obtaining additional funds from Duncan, Defendant continued to communicate with Neilitz about the need for more funds to pay for health insurance. Between March 23 and April 23, 2016, Neilitz and Defendant discussed that the investment would be used "[s]pecifically for the health insurance premiums for the ECS workers." (Tr. 17, Dec. 16, 2015 p.m.) On April 22, 2009, Defendant forwarded Neilitz a copy of Defendant's March 25, 2009 email to Duncan, which said that Defendant needed an additional investment to pay for health insurance coverage because the provider was threatening to cancel coverage. (Gov. Ex. Apr. 23, 2009 Neilitz Email.) Neilitz ultimately decided to invest additional money in ECS. He testified that he would

not have invested the money if he had known that it was going to Defendant's personal account or that Defendant would spend the money on personal expenses. (Tr. 21-23, Dec. 16, 2015 p.m.) Neilitz took out a three- to six-month loan from his bank and agreed to buy $50,000 worth of ECS stock at $125 per share. (Tr. 15, 18, Dec. 16, 2015 p.m.) Neilitz and Defendant (on behalf of ECS) signed a Stock Subscription Agreement, which provided that "[p]ayment of the total purchase price has been delivered to ECS simultaneously with the signing of this Agreement." (Gov. Ex. Apr. 24, 2009 Neilitz Email, Attachment at 1, 3-4.) Defendant instructed Neilitz to wire the funds to "William Corrigan, ECS Corporation" and provided the routing and account numbers for his personal account. (Gov. Ex. Apr. 23, 2009 Neilitz Email at 1.) Defendant received Neilitz's $50,000 wire transfer in his personal account on April 24, 2009. (Gov. Ex. Apr. 2009 Corrigan BOA Statement at 3.) This deposit raised the account balance from $4,932.19 to $54,932.19. (*Id.*)

On the same day that Defendant received Neilitz's funds, he wired $500 to Vasilenko. (Gov. Ex. Western Union Chart.) The next day, he booked an April 27, 2009 flight to Brussels, Belgium and a return flight leaving from Kiev, Ukraine on May 1, 2009. (Gov. Ex. Apr. 25, 2009 Corrigan Email at 1-2.) Defendant had written to Vasilenko earlier in the month about visiting her in the Ukraine. (Gov. Ex. Apr. 16, 2009 Corrigan Email.) Defendant traveled to Kiev as planned. (Gov. Ex. Apr. 30, 2009 Corrigan Email.) He used the funds in his personal account for expenses other than health insurance for ECS employees. (Gov. Ex. Apr. 2009 Corrigan BOA Statement.)

In short, Defendant did not spend any of the $110,000 from Rawah Partners or Neilitz on health insurance for ECS's employees. (Tr. 6, Dec. 17, 2015 a.m.; Gov. Ex. Summary Chart.) He did not pay the premium on the United Healthcare policy, which had been cancelled in January 2009. (Tr. 61-62, Dec. 15, 2015 p.m.; Tr. 69, Dec. 16, 2015 p.m.; Tr. 6, Dec. 17, 2015

a.m.).  He also did not transfer any of the money from his account to a state health insurance plan for the ECS employees.  (Tr. 60-62, Dec. 15, 2015 p.m.; Tr. 6, Dec. 17, 2015 a.m.[3])  Nor did Defendant transfer any of the investor funds that he received into an account held by ECS.  (Tr. 6, Dec. 17, 2015 a.m.)

Defendant did not complete the sale of ECS by May 2009.  In the following months, representatives of Rawah Partners asked Defendant multiple times about its $60,000 investment and Defendant said that the money was spent on health insurance for the ECS employees.  (Tr. 83, Dec. 16, 2015 a.m.)  On December 9, 2009, Leon Bailey of Rawah Partners emailed Lancelot requesting "specific details as to the use of the $60,000 investment" that was made on March 30, 2009. (Gov. Ex. Dec. 15, 2009 Duncan Email.)  Rawah Partners' attorney repeated this request on December 28, 2009.  (Gov. Ex. Dec. 29, 2009 Neff Email.)  Defendant responded that the money was used for health insurance for the employees.  (Tr. 85, Dec. 16, 2015 a.m.)  Neilitz also sought updates in the Fall of 2009 and Winter of 2009-2010 concerning "when we may see funds based on the money that was given to you and ECS back in May," (Gov. Ex. Dec. 10, 2009 Neilitz Email at 1; see also Gov. Ex. Jan. 20, 2010 Neilitz Email; Gov. Ex. Jan. 22, 2010 Neilitz Email.)

ECS terminated Defendant on July 6, 2011.  (Tr. 63-64, Dec. 15, 2015 p.m.; Gov. Ex. Mar. 21, 2012 Call Transcript at 6.)  Later the same month, Yarmie discovered that there was no record of payment to ECS for Rawah Partners or Neilitz's 2009 stock purchases.  (Tr. 65, Dec. 15, 2015 p.m.)  Yarmie contacted Duncan and Neilitz "to try to figure out how they had obtained stock without having to pay for it," and learned that Defendant had received the funds in his

---

[3] Defendant's trial exhibits include a $1,556 cashier's check that Defendant had issued to Illinois Comprehensive Health Insurance on April 14, 2009.  D. Ex. 20.  Instead of using the check to pay for insurance, however, Defendant deposited the check into his personal account on June 15, 2009.  (Gov. Ex. May 2009 Corrigan BOA Statement at 7-8.)  The bank stamped the check with the notations "NOT USED FOR ORIGINAL PURPOSE INTENDED"—*i.e.*, to pay for Illinois Comprehensive Health Insurance—and "No Payee Endorsements Found."  (Def. Ex. 20 at 2.)

personal bank account. (Tr. 65-67, Dec. 15, 2015 p.m.) Yarmie then contacted the FBI. (Tr. 67, Dec. 15, 2015 p.m.)

After the FBI began its investigation, Defendant attempted to buy back Duncan and Neilitz's ECS shares. Specifically, on November 7, 2009, Defendant sent separate emails to Duncan and Neilitz offering to repurchase their ECS shares for $800 per share, which was considerably more than the price that Duncan and Neilitz had paid in 2009. (Tr. 47, Dec. 16, 2015 p.m.; Gov. Ex. Nov. 7, 2011 Duncan Email 1; Gov. Ex. Nov. 7, 2011 Corrigan Email 1.) Neilitz did not accept the offer because Defendant "was not credible in [Neilitz's] eyes." (Tr. 48, Dec. 16, 2015 p.m.) Duncan responded to Defendant that he would have to think about the offer, because his "group feels they were misled with regards to ECS" and he understood that "the last $60k [his] family sent [Defendant] for health insurance never went into the company." (Gov. Ex. Nov. 7, 2011 Duncan Email 2, at 1-2.) Defendant responded by email to Duncan that "Your funds did go into ECS." This email is the basis for Count 3 of the Amended Indictment. See [80] at 7. Two days later, Defendant wrote to Rawah Partners' Controller, Patricia Barnett, that "I can assure you that your 60k was used to pay up Health Insurance in 2009," and "[b]oth Gabe [Vlad] and AJ [Yarmie] know this too." (Gov. Ex. Nov. 9, 2011 Corrigan Email.) This email is the basis for Count 4 of the Amended Indictment. See [80] at 8.

On March 21, 2012, Defendant and Duncan had a conversation over the phone, which was recorded. (Gov. Ex. Mar. 21, 2012 Call Transcript.) Defendant admitted that Rawah Partners' $60,000 investment "came to my account" to avoid a lien that may have been placed on ECS's account, but assured Duncan that this was done "to play it safe" and that "I paid the health insurance." (Gov. Ex. Mar. 21, 2012 Call Transcript at 2.) Corrigan also claimed that this "was done by board approval" to "protect the money for the insurance," and that he (Corrigan) "didn't want to do that." (Gov. Ex. Mar. 21, 2012 Call Transcript at 4.) Corrigan also claimed that "the

insurance was bought," but that ECS "moved everybody onto the state insurance plan and paid that up" rather than paying up the old plan, and that "kept everybody insured." (*Id.*) According to Corrigan, "the one person who did not get the insurance was me," because "[w]e didn't have enough money, and so I couldn't get it," even though "I'm the one that had the heart attack back in 2007." (Gov. Ex. Mar. 21, 2012 Call Transcript at 5.) Corrigan also stated that Rawah Partners' investment money "all was used for ECS." (Gov. Ex. Mar. 21, 2012 Call Transcript at 3.)

On November 20, 2013, Defendant was indicted and charged with four counts of wire fraud in violation of 18 U.S.C. § 1343.

## III.    Analysis & Conclusions of Law

### A.    The Elements of the Charged Offenses

The indictment charges Defendant with four counts of violating the federal wire fraud statute, 18 U.S.C. § 1343. The statute provides in pertinent part:

> Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.

18 U.S.C. § 1343.

To convict Defendant of wire fraud under § 1343, the Government must prove that he "(1) was involved in a scheme to defraud; (2) had an intent to defraud; and (3) used the wires in furtherance of that scheme." *United States v. Faruki,* 803 F.3d 847, 852 (7th Cir. 2015).

The first element, a scheme to defraud, requires "'the making of a false statement or material misrepresentation, or the concealments of a material fact.'" *United States v. Betts-Gaston*, 142 F. Supp. 3d 716, 724 (N.D. Ill. 2015) (quoting *United States v. Sloan,* 492 F.3d 884,

890 (7th Cir. 2007)). "This concept includes both statements that the defendant knows are false and 'half truths' that the defendant knows are misleading and on which he expects another to act to his detriment but to the defendant's benefit." *Sloan*, 492 F.3d at 890. "[M]ateriality (*i.e.*, a tendency to influence) is an essential element of a wire fraud prosecution." *United States v. Ghilarducci*, 480 F.3d 542, 546 (7th Cir. 2007); see also *United States v. Rosby*, 454 F.3d 670, 674 (7th Cir. 2006); Seventh Circuit Criminal Pattern Jury Instructions, p. 498. "[T]he very fact that the defendant[] made the misrepresentations" may "suggest[] that the defendant[] expected the statements to have a tendency to influence prospective investors." *Ghilarducci*, 480 F.3d at 547. A misrepresentation may be material "even though the victim strongly suspects that it is false." *Rosby*, 454 F.3d at 673.

The second element, intent to defraud, requires a "'willful act by the defendant with the specific intent to deceive or cheat, usually for the purpose of getting financial gain for one's self or causing financial loss to another.'" *Faruki*, 803 F.3d at 853 (quoting *Howard,* 619 F.3d at 727). However, intent to defraud "does not require that [the] defendant 'comtemplate[] harm to the victim or any loss,'" and "'a defendant's honest belief that his actions will ultimately result in a profit and not a loss is [legally] irrelevant'" to a wire fraud conviction. *United States v. Fard*, 775 F.3d 939, 944 (7th Cir. 2015) (quoting *United States v. Leahy*, 464 F.3d 773, 787 (7th Cir. 2011)); see also *United States v. O'Connor*, 656 F.3d 630, 644 (7th Cir. 2011); *United States v. Fernandez*, 282 F.3d 500, 507 (7th Cir. 2002). "Direct evidence of an intent to defraud is rare; a specific intent to defraud may be shown, however, by circumstantial evidence and inferences drawn from the scheme itself that show that the scheme was reasonably calculated to deceive individuals of ordinary prudence and comprehension." *Sloan*, 492 F.3d at 891; see also *United States v. Domnenko*, 763 F.3d 768, 773 (7th Cir. 2014) ("The intent to defraud may be established both from circumstantial evidence and inferences drawn by examining the scheme

itself.").

The third element, use of wires in furtherance of the fraudulent scheme, requires the Government to prove that the use of wires was "'incident to an essential part of the scheme'" or a "'step in the plot,'" but "[t]he use of the wires need not be an essential element of the scheme." *United States v. Sheneman*, 682 F.3d 623, 630 (7th Cir. 2012) (quoting *Schmuck v. United States,* 489 U.S. 705, 710-11 (1989)).

Reasonable reliance, justifiable reliance, and damages are not elements of federal wire fraud. *Neder v. United States*, 527 U.S. 1, 24-25 (1990); *United States v. Seidling*, 737 F.3d 1155, 1160 (7th Cir. 2003); *Ghilarducci*, 480 F.3d at 547.

### B.      Defendant's Liability

In light of the facts found and law outlined above, the Court concludes that Defendant is guilty of wire fraud in violation of 18 U.S.C. § 1343, as alleged in Counts 1 through 4 of the Amended Indictment. The facts as found above establish beyond a reasonable doubt that Defendant knowingly and willfully committed wire fraud on March 22, 2009 (Count 1), March 25, 2009 (Count 2), November 7, 2011 (Count 3), and November 9, 2011 (Count 4).

### 1.      Scheme to Defraud

The Court concludes that Defendant engaged in a scheme to defraud Rawah Partners and Neiltiz by making false statements and material misrepresentations and by concealing material facts. *Sloan*, 492 F.3d at 890. Defendant's scheme was to obtain additional money from Rawah Partners and Neilitz by falsely representing that the money was needed to pay for and would be used to pay for health insurance premiums for ECS employees.

Specifically, Defendant falsely represented to both Rawah Partners and Neilitz in March 2009 that ECS's employees would lose insurance coverage if he could not secure additional investments by the end of the month (Gov. Ex. Mar. 22, 2009 Corrigan Email; Tr. 66, Dec. 16,

2014 a.m.; Gov. Ex. Mar. 26, 2009 Corrigan Email at 2), even though the policy had been cancelled in January 2009 (Tr. 61-62, Dec. 15, 2015 p.m.; Tr. 69, Dec. 16, 2015 p.m.). Defendant also made material misrepresentations to both victims that the investment money would be used to pay for ECS's health insurance. (Tr. 72, Dec. 16, 2015 a.m. (Duncan); Tr. 17, Dec. 16, 2015 p.m. (Neilitz).) In fact, Defendant began spending the investment money immediately on personal expenses such as his girlfriend, his translator, and a moving service, but never paid the premium on the United Policy or purchased insurance for the ECS employees from a different insurer. (Tr. 6, Dec. 17, 2015 a.m.; Mar. 2009 Corrigan BOA Statement; Apr. 2009 Corrigan BOA Statement; Gov. Ex. Summary Chart; Gov. Ex. Western Union Chart).

Defendant also concealed a material fact when he told the investors to wire money to an account that he called "William Corrigan, ECS Corporation," without disclosing that this was Defendant's personal account rather than an ECS account. Duncan and Neilitz both thought that they were sending money to an ECS account and credibly testified that they would not have sent the funds if they had known it was a personal account or that Defendant planned to use any of the funds on personal expenses. (Tr. 69-80, 116, 135, Dec. 16, 2015 a.m.; Tr. 21-23, Dec. 16, 2015 p.m.)

After Defendant received and used the funds on personal expenses rather than insurance, Defendant sought to conceal the truth by falsely representing to representatives of Rawah Partners that the partnership's $60,000 investment had been used for health insurance for ECS employees. (Tr. 85, Dec. 16, 2015 a.m.) In a tape-recorded telephone conversation, Defendant told Duncan that all of the ECS employees except Defendant had been moved to a state insurance plan and "I paid the health insurance." (Gov. Ex. Mar. 21, 2012 Call Transcript at 4.)

The Court is not persuaded by Defendant's arguments for acquittal. First, Defendant argues that his alleged misrepresentations were not material because the investors got what they

bargained for: additional stock in ECS.  Defendant points out that ECS's marketing materials contained strong cautionary language warning investors about the riskiness of their investment. The Court is not persuaded by this argument, in light of: (1) the fact that ECS's marketing materials do not purport to give ECS or its officers a right to lie to investors about how investment funds will be used; and (2) the trial testimony from Neilitz and Duncan that they would not have invested additional funds if Defendant had disclosed that the funds were being wired to his personal account or that any of the funds would be used for personal expenses.  (Tr. 69-80, 116, 135, Dec. 16, 2015 a.m.; Tr. 21-23, Dec. 16, 2015 p.m.)  Again, the Court finds this testimony credible.  Both Neilitz and Duncan already had substantial funds invested in ECS already when Defendant contacted them about making additional investments.  Defendant represented to them the sale of ECS was going to close soon, at a high price, but that the sale was put into jeopardy by ECS's inability to pay for insurance for its engineers.  Neilitz and Duncan understandably wanted to ensure that the deal would close so they could recover and realize a profit on their investments.  But there is a vast gulf between paying in additional funds to ensure the payment of health insurance premiums for key employees who presumably would be doing the work needed to close the deal and paying in those funds to support Defendant's overseas romantic interests and other day-to-day living expenses.

Second, Defendant argues that it was unreasonable for Duncan to rely on his misstatements, because Duncan's Chief Financial Officer had advised Duncan not to make the investment.  Ultimately, this is irrelevant because a misrepresentation may be material even when the victim strongly suspects it is false, *Rosby*, 454 F.3d at 673, and reasonable/justifiable reliance is not an element of federal wire fraud, *Neder*, 527 U.S. at 24-25; *Seidling*, 480 F.3d at 547.

Third, in his supplemental filing [100], Defendant compares this case to *United States v. Weimert*, 819 F.3d 351 (7th Cir. 2016), in which the Seventh Circuit recently held that the defendant company president did not commit wire fraud by misrepresenting to his board of directors that the proposed buyer of the company's assets required him to participate in the purchase (rather than telling them the truth, that it is was his idea to participate in the purchase and receive extra compensation for his participation), because the Board was misled "only about the negotiating positions—the preferences, values, and priorities—of other parties" and not about the nature of the assets it was selling or the consideration it received. *Id.* at 366. The majority opinion in *Weimert* explained that the defendant's interest in the sale had been fully disclosed to the board and his deception amounted to no more than a false prediction about how the potential purchaser would respond to a counteroffer to exclude his participation, which did not amount to a scheme to defraud. *Id.* *Weimert* is distinguishable from the present case because the evidence here establishes that Defendant affirmatively mispresented material facts to Neilitz and Duncan, including that the additional investment funds were needed to prevent the cancellation of the ECS employees' health insurance policy (when the policy had already been cancelled), that the funds were going to his personal account rather than the ECS account, and that the funds were, in fact, used by Corrigan to pay the health insurance. These are statements about "facts and promises of future behavior"—which *Weimert* recognizes are actionable—not about "negotiating positions," as in *Weimert*, 819 F.3d at 358.

For these reasons, the Court concludes that the evidence establishes, beyond a reasonable doubt, that Defendant engaged in a scheme to defraud Rawah Partners and Neilitz.

### 2. Intent to Deceive

The Court also concludes that Defendant, for the purpose of his own financial gain, intended to deceive Rawah Partners and Neilitz and engaged in willful acts to do so by

representing that additional investments were needed to pay for health insurance, using the money for personal expenses, and then attempting to conceal the fact that he never paid for the insurance.[4]  Defendant's intent to deceive can be inferred from his misrepresentations, which were just discussed in Section III.B.1, above.  The strongest evidence of Defendant's intent to deceive is his emails to Leshenko and Vasilenko prior to his receipt of the investment funds, assuring them that he would be getting funds from investors and would be sending them wire transfers.  (Gov. Ex. Mar. 23, 2009 Corrigan Email 1; Gov. Ex. Mar. 27, 2009 Corrigan Email; Gov. Ex. Apr. 16, 2009 Corrigan Email.)  These emails demonstrate that Defendant solicited and accepted the money with the intent to use it on personal expenses.  Defendant's instructions to Rawah Partners and Neilitz to send the investment funds to his personal account, without disclosing that it was not an ECS account, is further evidence of Defendant's intent to deceive his victims.  Defendant had been instructed previously by ECS's contract accountant that having company funds sent to his personal account would be illegal and would prevent proper accounting for the funds.  (Tr. 20-21, Dec. 16, 2015 a.m.)

The Court is not persuaded by Defendant's argument that he did not have the requisite intent to defraud because he told investors to send money to his personal account solely to protect it from a judgment and notice of lien that had been placed on ECS's account.  Defendant did not disclose to the investors that this was his personal account, led them to believe that the money was going to an ECS account, and then immediately began spending the money on expenses that had nothing to do with ECS.  Moreover, if Defendant's only goal was to protect the money from the lien, then ECS could have opened another account that was not subject to a lien.  Whether the funds were seized from ECS's LaSalle Bank account by a lien creditor or

---

[4] The Government is not, as Defendant argues ([92] at 4), required to prove that Defendant intended to cause a loss to his victims. *Leahy*, 464 F.3d at 786-87.  It is enough that Defendant sought financial gain for himself.  *Fard*, 775 F.3d at 944.

judgment holder or by Defendant himself from his personal account, they were not available for legitimate company purposes, such as paying health insurance premiums as Defendant had represented to the investors.

The Court is not persuaded, either, by Defendant's argument that he might have believed that the cash he withdrew from his account and transferred to other individuals was used for health insurance. The evidence presented at trial does not support this defense theory. Most notably, it is inconsistent with what Defendant told Duncan following Defendant's termination. In their tape-recorded telephone conversation, Defendant told Duncan that "*I* paid the health insurance" and represented that this "kept everyone insured" except Defendant himself. (Gov. Ex. Mar. 21, 2012 Call Transcript at 2 (emphasis added).) This evidence undermines the theory that Defendant believed that the insurance had been paid by someone else even though it had not. It also undermines Defendant's argument that it is impossible to know, without access to ECS's "Quickbooks" accounting program, if someone other than Defendant paid the health insurance premiums.

Similarly, the Court rejects Defendant's argument that, without access to ECS's Quickbooks records, there is no way to know whether Defendant misused any of ECSs' funds. Even if Defendant transferred some of the funds from his personal account to ECS, Defendant has no rational explanation for why it was appropriate for him to use any of ECS's funds to pay Leshenko or Vasilenko or to buy the personal items and services shown on his Bank of America account statements. Indeed, even Defendant concedes that "a moderate amount [of the money withdraw from his account] was kept by [Defendant] for his own purposes." [92] at 27.

Finally, the Court rejects Defendant's argument that ECS's marketing materials, which cautioned investors that there was no market for ECS shares, demonstrate his lack of intent to deceive. Regardless of what the marketing materials say, when Defendant solicited additional

investments from Duncan and Neilitz, he represented that the sale of ECS was imminent, that all ECS shares would be purchased at an estimated price of $800 per share, and that he simply needed an additional $50,000 dollars to pay the insurance premiums until then. (Gov. Ex. Mar. 26, 2009 Corrigan Email at 2; Gov. Ex. Apr. 23, 2009 Neilitz Email.) The marketing materials certainly provided no indication that, contrary to Defendant's express representations, funds provided for ECS company purposes could (or would) be immediately appropriated by an ECS officer for his own purposes, without the knowledge or approval of ECS's board.

For these reasons, the Court concludes that the evidence establishes, beyond a reasonable doubt, that Defendant intended to deceive Rawah Partners and Neilitz.

### 3.    Use of Wires

The Court concludes that Defendant used the wires in furtherance of his scheme to defraud. The March 22, 2009 and March 25, 2009 emails charged in Counts 1 and 2 of the Amended Indictment, respectively, furthered the scheme by soliciting additional investment funds from Neilitz and Rawah Partners based on the false representation that the money was needed to prevent ECS employees from having their insurance cancelled. The November 7, 2011 and November 9, 2011 emails charged in Counts 3 and 4, respectively, were intended to further Defendant's fraudulent scheme by lulling Rawah Partners' representatives into believing that their money had been used to pay for health insurance for ECS employees, while in fact Defendant had used most of the funds on personal expenses. *McGowan*, 590 F.3d at 457; see also Section I.B.2, *supra*.

For these reasons, the Court concludes that the evidence establishes, beyond a reasonable doubt, that Defendant used the wires in furtherance of his scheme to defraud. And, as all three elements of wire fraud have been established beyond a reasonable doubt through the testimony and evidence introduced at trial, the Court concludes that Defendant violated 18 U.S.C. § 1343

on March 22, 2009, March 25, 2009, November 7, 2011, and November 9, 2011, as charged in the Amended Indictment.

**IV.    Conclusion**

For the reasons stated above, the Court: denies Defendant's motions to dismiss on immunity grounds ([18] and [27]); grants Defendant's motion for leave to file a reply in support of his motion to dismiss [98]; denies Defendant's motion to dismiss [75]; grants the Government's motion *in limine* [68]; grants Defendant's first-filed motion for leave to file an over-size post-trial brief [94]; denies as moot Defendant's duplicate motion for leave to file an over-size post-trial brief [96]; and grants Defendant's motion to file a corrected table of contents to his post-trial brief [95].   The Court further concludes that the Government's evidence is sufficient to sustain convictions on Counts 1, 2, 3, and 4 of the Indictment.   This matter is set for status on September 28, 2016 at 10:00 a.m..

Dated: September 15, 2016

_____
Robert M. Dow, Jr.
United States District Judge